12-092 Atauga Quality Cotton Association v. Crosby. We have Mr. Bailey for the appellant and Mr. Lowry for the appellees. Mr. Bailey, you may proceed when ready. Thank you. May it please the Court, with your permission, I will assume you already understand the nature of the Crosby's betrayal of their association while he sat on the board of directors of the Atauga Quality Cotton Association. And I also spare you a lengthy dissertation on the long and rich history of the cooperative marketing associations, which establishes that they're favored and beneficial entities with a strong public policy need for enforceable liquidated damages provision. I would like to skip to the crux of the situation, and that is whether or not the liquidated damages provision in our contract with our members as part of our association was reasonable. While we believe the liquidated damages provision should be viewed under a liberal view or as only unenforceable if they're determined to be grossly excessive, we believe this liquidated damages provision meets the reasonable test that's normally a reasonableness test normally applied to business contracts. So are you going to proceed principally under the Camelot, the three-factor Camelot test instead of the liberal enforcement or the statute? Are you going to argue the statute to us as well? I don't intend to, not today. I just I think if if the reasonable test is met, all these other questions are irrelevant and not if it's if it's if it's reasonable under the standard test, then it passes musters under any higher or better standard that you could apply. It seems to me that this is pretty harsh penalty. The highest the highest price that the association got is just seems to me to have no relationship to what your actual estimate of damages would be. And I assume you're saying you're going under the traditional rule today, just just for today. Yes. For the purpose and it sure looks like a penalty to me under the traditional rule. Well, you're right, Judge. The under the traditional rules, it does seem to be the eye of the beholder. You know, freedom of contract goes out the window and then, you know, the parties agree on a liquidated damages provision. And the court says, well, it just doesn't seem fair. Would it seem fair if they had to just pay the average price? Well, I mean, in your paraphrase of the provision, you repeatedly insert the word average, which does not exist. No, I mean, I guess the provision right says the price of such cotton on the New York futures market during the period beginning with the date of breach and ending with the final delivery. And you keep saying the average price of such cotton. And I think you have to do that because, as you know, the price of cotton will fluctuate over time. But average might make some sense. But lowest could make sense. Highest could make some sense. Median might make some sense. Why average? Well, I was just as an example. We know what the average price of cotton was. Well, excuse me for interrupting, but I thought maybe I have the I thought your formula measured it from the highest price you got, even though it was a small volume that you sold at that highest price, less the average price. It does. That is so. So really, the highest price is what you're trying to get. In other words, your formula assumes that if the cotton had been delivered, you would have gotten the very highest price you got for a very small volume during that time period.  Right. In this case, if the average price had been the liquidated damage provision, the liquidated damages would be twice what we are claiming in this case. And the only way that works is you take the highest price we were able to get after the breach and you subtract the average, which leaves a the average was in the range of a dollar fifty six a pound. When you do the calculation in our liquidated damages provision, it's seventy three cents a pound. I think Judge Anderson and I are asking about two potential problems with your argument. One, his question is why highest? I mean, is that is that a reflection of reality that you actually would have gotten the highest price for cotton post breach? That's that's I think Judge Anderson's question. Where's that come from? And is that does that have any relationship to the real world or is it simply a penalty provision? Well, up to this point in time, the highest cotton market since the Civil War, the difference between the highest and the average might have been 10 cents at max most years. I mean, when this was written, we didn't know that prices were going to go to two dollars and 30 cents a pound. It never happened before. But I guess which way does that cut? Right. Because we're asking, in part, what was the intention of the drafters? Was it an intention to approximate damages or was it an intention to penalize? And if you didn't know at the time you drafted it and you chose the term highest, sounds to me like it might have been an intention to penalize. Well, it was an intention to let the market decide what the penalty or liquidated damages provision is going to turn out to be, whichever way you look at it. It's using the market to determine what you pay if you don't deliver your cotton. Because we don't have the ability to know what that is going to be. We don't have the cotton to sell. We don't know. We can't. We can't fix compensatory damages. We need a liquidated damages provision to protect the existence of these associations. If all of them, if what you're saying is you need a penalty in order to protect the existence of the association. Only in the sense that Williston and Contracts says that liquidated damages provisions have that element of them, the element of trying to ensure performance. They all do. But in this situation, the authors of the contract, and we don't know how long it was used, several years. I thought the Alabama law was pretty clear that the indication, the two principal indicators of penalty and therefore voidness under Alabama law was number one. Is it a reasonable estimation of your actual damages? And number two, if it's a penalty and if it fails those two, then it is void under Alabama law. Am I wrong about the Alabama law? I think you've, the way I would, I think you're correct. I would phrase it that there are two basic things you have to show. One, you have to show that it's very difficult, if not impossible, to figure out what the true damages would be. And I think everybody here, basically, that's water under the bridge, right? We're talking about the other pieces of it. And then that the, and in light of the fact that it's hard to do the damages, you do a reasonable attempt to approximate what these unspecified, uncalculable damages would be. And if you do both of those things, it should be enforceable under any test. I guess that's, I guess that's what we're getting at is you're saying it is reasonable and we're kind of pushing back and asking you some questions about that. Is it fair for us to then look at what the, if you actually apply this, at least what the other side will say, is that you would be entitled to much more than their actual profit was? Or should we be looking at that to see that this was, in fact, not a reasonable estimate? I don't understand why you would look at their profit. The, if you assume that we could get $2.30 a pound in the market, why wouldn't we assume they could get $2.30 a pound in the market with this two million pounds of cotton that they had? Because you get that only at a particular small time period. Well, Judge, if . . . There's no . . . to think that you were going to get that high price for the entirety of the 4,000 bales that were not delivered seems to me to be most unrealistic. My point is they could have gotten the same price. If they had gotten the same price with their cotton, they would have made over $5 million. They could have paid our liquidated damages and walked home with $3.5 million. It's all about what the price of cotton does during the period of time after the breach and before the market, I mean, the crop year is over. Why would it not be fair to say to somebody, if you're going to not deliver your cotton, that you will assume that we could have sold your cotton at the highest price less the average price, less the average price? Can you help me again just to circle back because I think I might have stepped on Judge Anderson's question earlier about highest. But can you help me to understand where it is that the other factor, the average, where is it that average shows up in the formula? Where does the word average show up in the formula? It doesn't. It's like you said. It's the price on the New York market from the time of breach to the last delivery of cotton. So that's a period of time. The price changes every day. It changes during the day. So that's why we interpret it to mean average. And the other side, though, says that's actually a bug in the formula is that it's sort of fatally ambiguous, ambiguous for a number of reasons, not the least of which is that it doesn't even specify sort of which price we're supposed to be looking at. Why not median? Why not lowest? You just sort of were picking average to make the formula work so that you have a mathematical equation that you can work. But in fact, the formula doesn't reduce to a mathematical equation. And isn't that a problem? Well, if you take an average, it does. I mean, it calculates out to four decimal points in accuracy. But I'm just saying that you're required to sort of insert a fudge factor to make the formula work. Yeah, well, there are arguments to be made about how to tweak the formula that they have made that would change it a little bit either way. But that does not mean it's void as against public policy, which is what the district court said. This is void against public policy. And we know we've had years of history with these things where they use 10 cents a pound. That'd be double what our damages would be in this case, brought to present value, adjusted for inflation. Okay. You want to reserve the remainder of your time? Yes. I'm sorry. Good morning. If it pleases the court, I'll meet my colleague on the ground that he's laid out, which is the reasonableness of this provision under Alabama common law. Even if you assume, utterly unrealistically, that the association would have gotten the highest price they got for even the smallest quantity of cotton for the Crosby's share, the Crosby's would have gotten the lion's share of that. The association's share of that unrealistically high price, even if they had gotten that for the Crosby's cotton, wouldn't somehow be the delta between that high price and some average New York, if you want to insert the word average, some average New York futures price. This clause doesn't come close to meeting Alabama law. And it strikes me what a pivot this is. The argument that they lead with and that dominates the reply brief is one that comprised fewer than two pages before the district court. And the only evidence of reasonableness they offer is the deposition of their expert, John Mitchell. That's their expert on how to apply this formula. And he repeatedly testified that this formula does not approximate the association's out-of-pocket loss or its lost profits or any other kind of actual damages that he could think of. He said it's not trying to calculate anything resembling actual damages or any calculation of what Ataga had to pay out-of-pocket. Instead, he five times explains this provision as a disincentive to breach. Now, I'm not claiming he's got special knowledge of the subjective intent of the people who actually wrote this and signed it. But he is an expert, according to them, on how this provision operates. And he's an expert on cotton marketing. And the justification he can think of this provision walks them squarely into Alabama penalties law. Now, in fairness, I guess, doesn't he – maybe it's cleanup, but doesn't he sort of go back? They've got some testimony that they cite at page 7 of the gray brief that says he did say it's supposed to approximate some loss to Ataga, some attempt toward making Ataga whole, but we really can't just know the right number. So I think that's their best quote. It's at page 397 of the deposition, and it says it's some calculation of the grievance, grievous damage done to Ataga or the pool. It's not a specific calculation. It's not a make Ataga whole. It is an incentive that is in the direction of damage that is a disincentive for a farmer not to perform. That's their best quote, and that doesn't get them there. What they would need is evidence that their likely loss in the event of a breach would somehow be captured by this formula. And if this formula ever captured their likely loss in the event of non-delivery, it would just be an accident. First of all, glaringly, it doesn't account for the fact that the farmer gets the gross share, lion's share of the sales price. That's why you market through an association. Yes, they take a cutoff to cover administrative and marketing expenses. But this formula doesn't measure that loss contribution to overhead. It doesn't measure anything that would have happened had the farmer delivered and the association sold. It is, as I think the panel has rightly observed or at least implied with questions, completely arbitrary. The top driver of the formula is the highest price the association received for any quantity of cotton, no matter how small, at any point in the growing year. Their expert, John Mitchell, conceded, as he had to, that that price is not representative even of the trades that same day, let alone the trades over the whole growing season. I mean, can you imagine the association coming into court and trying to prove its damages, if it had to prove damages, by using a price that it achieved one time on less than one-tenth of one percent of all the cotton they sold? That is what the Supreme Court referred to unanimously in its Miller, the Alabama Supreme Court, referred to unanimously in its Miller decision as an arbitrary calculation with no correlation to actual loss. Now, as it turns out, this liquidator damages 80 percent of the gross sales price of the cotton, leaving my clients with 20 percent. But depending on the price at which the farmer sells, the highest price the association can get for any tiny quantity of cotton, and what is happening with the New York futures market, there is no reason why this formula couldn't produce a number much larger than the gross sales price of the cotton. There is no reason whatsoever why this formula couldn't do that. If my brother and sister will permit me, I'm going to suggest that we move to what I consider a much stronger argument for the association, and I doubt that we would hold the association to a waiver or an abandonment of its position because it did take these other positions in brief. Is that all right with you all to go forward? I think the association has a pretty good argument that whether or not the statute 2-10-65, whether or not that applies, the Alabama Supreme Court, which has never addressed this, would take the position that because of the peculiar situation of an association, it would not apply the traditional rule with the same strict scrutiny that Alabama courts often do. But because it is absolutely necessary for the existence of the association, in any association of this kind, that their deliveries of cotton actually be delivered, because obviously the association is going to be engaging in futures contracts and it needs to have the commitments that it is expecting. Therefore, I think what the Alabama Supreme Court would do is to moderate that somewhat to indicate that although some disincentive is appropriate because of necessity, there cannot be one that is arbitrary and trouble is the line drawing too harsh. So two things about that. One, the first point is they don't need leeway. They don't need looseness. They need a decision that would allow them to enforce a provision that has no relationship whatsoever to actual damages. So that's thing one. They would need a complete sea change. Thing two is when I read the Alabama case law, I come away absolutely convinced that the Alabama Supreme Court would never do what you said unless the legislature had acted. And if you look at a case we cite in our May 2nd Notice of Supplemental Authority, we're responding to the Turex case that they cite. We cite a case called N. Ray Ancrum, which is a 2013 Alabama Supreme Court decision. And the parties there made public policy arguments about how the Alabama Supreme Court should decide that issue of statutory interpretation. And the Alabama Supreme Court said we don't do that. We don't make policy. We look at legislative text, the text of the statute. The Alabama Supreme Court is not going to decide that it is such an expert in agricultural policy that cooperative marketing associations have to be allowed to enforce provisions that aren't enforceable in any other contract in Alabama. Can I ask you a question about just the Articles 3 and 4, the separateness of Articles 3 and 4? Could, and I'll ask your adversary as well, but could ATAGA have incorporated under Article 3 if it had wanted? I believe so. They would have had to make whatever organizational adjustments are required by that article, but they could have chosen the Article 3 path. They did not. And what the only thing the legislature has said, the only hook that the Alabama Supreme Court could rely on to make that public policy ruling that you're talking about, Judge Anderson, is the use of the word liquidated damages in a 1921 statute saying you can include liquidated damages in your marketing agreements. Well, under Alabama— That's 2-10-65. It is, Your Honor. And under Alabama law, two things were perfectly clear at that time. First, that liquidated damages had a well-settled common law meaning that means the Camelot Standards, because that's not new law. That goes back to the 1800s. The other thing that was perfectly clear to the legislature is that the Alabama courts then and now read common law terms of art in statutes to have their common law meaning. So if the legislature, which is the sole policymaker in Alabama, meant to exempt agricultural marketing associations from the rule against penalties, there's no way it would have simply said you can include liquidated damages. They would have known what that meant, and they would have known the courts would have interpreted it that way. So the odd thing to me about that argument is then what is the legislative purpose for including it in 3 but not 4? I mean surely it must give some kind of bump, right? Well, so I don't think so, but this is what I think. In the 1920s when marketing associations, at that point when the statute was being passed, there was a fair amount of suspicion and hostility to marketing associations. And it made sense for the legislature to clarify, for example, that they could obtain specific performance because the statute says that. You and I might think of that as default law, right? You can always get specific performance of a contract if you meet the equitable standards, but they specified that. They specified that you could have liquidated damages provisions because otherwise those might have been, as they were, attacked as contracts and restraint of trade. Now look at what they did when they were concerned that the Alabama courts would apply common law restraints in ways the legislature didn't want. Look at 21071. 21071 says these associations are not subject to the Alabama laws against restraints on trade. If they had wanted to send the signal to the courts, by the way, we don't want you to enforce the traditional limitations on penalties, they would have done something like that. And remember in Alabama, the common law is codified. Alabama Code 1-3-1, they have adopted the common law except insofar as the legislature has specifically enacted statutes in derogation or modification of the common law. Does it matter to your argument in 21065 that the statute says at the end, and any such provision shall be valid and enforceable? I mean, any is a broad word. Right. The terms that I would focus you on are such provisions because such provisions refers back to the phrase may fix as liquidated damages specified sums. And before I stray from specified sums, that's important. If the association is right that this statute is in derogation or modification of the common law, you have to strictly construe it according to its terms. Specified sums matters. You can't read that as mere surplus. It is rational for the legislature to say, okay, but the farmer has to know there's a specified sum before breach. This formula is as far from a specified sum as you can get. It's a multivariable formula. But the real kicker is it is unknowable until the growing season ends. Because the market values that populate it, even if you ignore all the missing specifications, and you shouldn't, those values are unknowable at the time of breach. So even if you thought the statute was in derogation of common law, and even if you thought an Article IV association could invoke it, you'd have to find this. You still couldn't say this provision because it's not a specified sum. What are the remedies that are available to the association? Your clients clearly breached the agreement. I'm assuming that that's not in dispute. Well, it is in dispute. It's just not the issue on this appeal. Okay. I mean, that's not the basis on which the district court ruled. Okay, but assuming a breach for the sake of argument. That's right. Specific performance. They have specific performance. Which they did not seek at the time. That's correct. And then actual damages? That's correct, Your Honor. And is there any evidence in the record of actual damages? So the district court held that there was not, and the district court was correct, and that finding is not challenged on appeal. They put nothing in. They cited only the deposition of their expert who didn't do any actual damages calculations, no proof of actual damages whatsoever. And that, I know you don't want to hear about the common law, maybe, but that kills them under Camelot because the third prong of Camelot is applied after the fact, according to the Miller case, and if you can't prove any damages, you can't possibly prove the sum you estimated was reasonable under Alabama law. Is it the timeline of when 3 and 4 were enacted that you think explains? You were talking about sort of the context of 1921. Is it the timeline that explains why, yes, an enforcement provision in 3, no enforcement provision in 4? So, yes, I think so, and the other bit of objective evidence I would offer you, not just the lapse of time, but also the Article 4 doesn't have that express preemption of common law restraint on trade law, and all of that is just an indication these associations were coming into more acceptance by that point, and the legislature didn't feel the need to specify that they could do things that any corporation could do and that could be present in any contract. Should we be certifying any questions to the Alabama Supreme Court? We certainly have heard Judge Anderson saying here's what I think the Alabama Supreme Court would do, and you say I disagree. Absolutely you shouldn't because you have, to quote this court, sufficient sources of law to allow a principled conclusion. I'm citing Hammond v. Department of Corrections 822 F. 3rd 1201, but you said it a number of times. You know how Alabama treats liquidated damages provisions. You know how Alabama interprets statutes. You know from that Ankram case that I referred back to that Alabama courts don't create policy. They look to the legislature and they look to text. Now, their bare hope that the Alabama Supreme Court might throw everything in reverse and enact a sea change in Alabama law doesn't justify adding another 12 to 18 months to this proceeding and a new court. You, as you say in the Hammonds case and many others, you use much judgment, restraint, and discretion in certifying. And think about the things that would have to happen. So they can't possibly win under the common law. Alabama Supreme Court would have to decide that an Article IV association can invoke an Article III provision, contrary to how the courts interpreted those articles. They would have to decide that liquidated damages as used in that statute doesn't mean the common law, but means something much broader at common law, something that was actually antithetical to the notion of liquidated damages at the common law, contrary to all Alabama rules of construction. They would have to decide that this multivariate formula that is unknowable until the growing season ends, unknowable at the time of breach, qualifies as a specified sum. And finally, they would have to decide the extreme version of this argument, not just that we're going to be more liberal, we're going to be more loose, that we're going to allow them to enforce a provision that has no relationship whatsoever to actual loss, that could in any given year double, triple, dwarf the entire amount the farmer got for his cotton. And I guess on that point I should add, they make the argument that if we had just waited longer in the market and sold for more, we wouldn't have as much to complain about. You know, look, that's another way of saying this provision has no relationship whatsoever to the price at which a farmer sells his cotton. You know, if we'd sold earlier, we would have lost even more. That doesn't make the provision enforceable. I think we're coming up on tongue-in-cheek time and red light time. Are there any more questions before I sit down? Thank you very much. Thank you. All right, five minutes. Yes. Could we have chosen the Article III path? Yes, it was there at the time. The Article IV path has tax benefits. And I'll point out that when an Article III association sought those tax benefits that weren't in Article III, the Alabama courts said they could do that, that an Article III association would be tax exempt just like an Article IV exemption. This is the Court of Civil Appeals decision that you cited? Yes. I can't remember the name of it. Maybe Franklin? Yes, sir. And the most recent case that we sent, that's not an association case. They did the same thing in another context. But essentially, you concede, right? No explanation in that decision. It feels a little ipsy-dixitish to me. I would concede that the history of how all the – there were three – I mean, Alabama had a Cooperative Marketing Act before anybody else. And then the Cooperative Marketing Act came in in 21, and they changed that. And then in 34, I mean, we had an Agricultural Marketing Act. And it is – I can't tell you what they meant or why they left out the restraint of trade in Article IV. I mean, I think it's just as reasonable to think they thought it was already in Article III. They didn't need to say it again. It just seems to me that if you've got a choice, you've got three – you're looking at three and four. Four, you say, has tax benefits, some burdens perhaps. Three has the liquidated damages benefit, perhaps not the tax benefits. And you make a choice. You sort of opt in. Do you want tax benefits or do you want liquidated damages? And having made the choice for tax benefits, you can't simply just sort of cross over to Article III to get the benefit as well of a provision that applies only to Article III associations. Except that in Article II, that applies to everything. We say, such associations are declared to be impressed with a public service. And every such association shall be subject to the supervision, inspection, and investigation of the commissioner. So Article II says all of these associations have a public service. So why would the statement that a liquidated damages provision in Article III shall be enforced mean – With respect to associations incorporated under that article, right? Right. Shall be enforced and assume that they shall not be enforced in Article IV associations. So what about sort of the ordinary canon of construction that says that where the legislature has included language in one section of the statute but not in another section of the statute, that that is presumed to have been an intentional choice? And I'm not just making that up. I mean, the U.S. Supreme Court has said that a thousand times. Well, we urge you to read these in pari materia, which is another statutory instruction. But doesn't that canon really only apply where there's a conflict? Here there's not a conflict. There is no conflict. Right. But, I mean, isn't that the purpose of in pari materia is to sort of smooth over conflict? And here there's no conflict. It's just that Article III includes the provision that you want to take advantage of but you happen to be in Article IV. Right. That's true. But this is in Chapter 10 of the code, cooperatives and associations. All of these are in that group. And they're all impressed with public policy benefits that would indicate that you would not – the statement that there's no relationship to actual damages, the problem is you don't know what the actual damages are in these situations because the person hasn't delivered the cotton. What Mr. Mitchell said, and there's no dispute, there were 2,245,000 pounds of cotton that were not delivered in December, January, March, February of 2010 and 11. That had incredible value. And the argument is you have no damage at all. You have no damage at all when you've got – you're missing 2.2 million pounds of very valuable cotton in an upmarket. And all our liquidated damages provision doesn't say. We got actually $2.30 a pound in a shipment of much more than 1,800 bales of cotton. It was a very large purchase at $2.30. We were able to get that in March. If they had delivered their cotton to us, it would have been sold during the period of time from November 3rd through March. So our liquidated damages provision – You don't know that their cotton was delivered in March, do you? We know their cotton was delivered before the end of December. All their cotton was sold to Cargill by December 3rd. So how can you assume that you would have gotten it in March? Well, we don't know when we would have gotten it. It should have been in a warehouse subject to us selling it before December 3rd. We should have been able to have it then. When we found out we didn't have it, that's when the time period runs on this liquidated damages provision. It's not the average price of the whole year. It's not the price of the whole year. It's the price from the date of breach to the last date of any cotton being delivered to us and the highest price that we were able to obtain on a significant amount of cotton, which we had during that period of time. And what I don't understand is if we had just applied – if we just said the lowest price for cotton during that period was 70 cents a pound, which would be incredible because it was not the lowest price, and that's all you get, that's what our liquidated damages provision generated at 73 cents a pound. That's what our provision is. Because it uses the – it just subtracts the average price from the highest price. If it didn't – if it was only the highest price, I would understand. That does sound pretty harsh. But it's the highest price less the average price. And it comes down into a range which is lower than the average price of cotton by half during the period of time we could have covered. Let's just say we hadn't had any futures markets and we just had a contract we had to cover. What would we have had to pay to replace the $2.2 million worth of cotton? And it would have been, Judge, in the 90s to $1 to $1.5 is what we would have had to cover. So to say there are no damages here, which is the net effect of this opinion, we have strong evidence of a member of the Board of Directors knows what our hedging strategy is, knows that we've locked in our prices at 71 cents, which is what our members got that year for every pound of cotton that they produced and gave to us. They netted 71 cents. He knew this. Prices start going up and he starts leaving. Got it. Thank you so much. I think we've got your arguments. Thank you.